## CASSIDY v. FIRST NATIONAL BANK OF MIAMI, Executor.
### No. 59-C-3260.

Circuit Court, Dade County.
July 29, 1960.

---

Russell C. Gay and Roy L. Struble, both of Miami, for plaintiff.

Shutts, Bowen, Simmons, Prevatt & Boureau, for defendant.

MARSHALL C. WISEHEART, Circuit Judge.

This cause originated upon a complaint filed by the plaintiff, James M. Cassidy, as administrator ad litem of the estate of John

P. Cassidy, deceased, against the defendant, the First National Bank of Miami, as executor of the estate of Florence Deegan Cassidy, deceased. The plaintiff seeks to impress a constructive trust upon all the assets of the estate of Florence Deegan Cassidy that were obtained by her from her husband, John P. Cassidy, subsequent to January 1, 1955, alleging that his mental and physical condition was such that he was incompetent and lacked the capacity to effect transfers of his property. An accounting of all the dividends, stock splits, cash and interest from these assets is also prayed for.

The defendant filed an answer admitting that it was acting in a dual capacity as executor of the estate of John P. Cassidy and as executor of the estate of Florence Deegan Cassidy; that James M. Cassidy, another brother, Michael Kaufman, a nephew, Marjorie Kaufman, a niece, and Mary Kaufman, another niece, are legatees under the will of John P. Cassidy and interested in his estate; and that the plaintiff is the duly appointed administrator ad litem of the estate of John P. Cassidy.

As to the other allegations set forth in the complaint, the defendant says that it is without knowledge as to the truth or falsity of these allegations and that it denies that it wrongfully detains these assets. An affirmative defense is set up that the claim filed in the county judge's court is defective and void.

Upon these issues made by the pleadings, the matter came on for final hearing before the court. Evidence was submitted by the parties. At the conclusion of the trial, the plaintiff moved for leave to amend his complaint to conform to the evidence pursuant to Florida rule of civil procedure 1.15(b) and by said amendment charges fraud, undue influence, and forgery of Florence D. Cassidy in obtaining all of the principal assets of her husband, John P. Cassidy, within the last nineteen months of his life. During this period, he was suffering from heart trouble, leukemia, senility, generalized arteriosclerosis and specifically cerebral arteriosclerosis, which caused him to lack the capacity to know the extent of his property, to have the requisite donative intent, and to be unable to know the effect of signing the instruments which transferred the properties alleged to be gifts by the defendant. At the same time, the defendant argued its motion for summary judgment.

Upon the evidence presented and the arguments delivered in this cause by counsel for the respective parties, and the court being fully advised in the premises, it makes the following findings of fact and arrives at the following conclusions of law —

## Findings of Fact

1. In 1951, John P. Cassidy, a widower, 73 years of age, married Florence Deegan, a first cousin 31 years his junior who had, prior to this time, worked and earned her livelihood as a typist. Prior to 1951, when they purchased a home in Coral Gables, they were residents of Chicago where John P. Cassidy had a wide acquaintanceship and had there, through his own efforts, amassed a substantial fortune. Most of his relatives and friends were also Chicago residents. He was a stranger to Coral Gables; had very few friends and no relatives in this area.

2. In January 1953, John P. Cassidy was confined to the Woodlawn Hospital in Chicago with a heart attack. After discharge from the said hospital on March 1, 1953, he was accompanied from Chicago to Miami by a nurse. At this time, and for some years past, John P. Cassidy had been suffering from leukemia.

3. His mental and physical condition progressively deteriorated to such an extent that during the year 1955 he was unable to handle his financial affairs. His 1953 federal tax return was the last one in which he was able to be of assistance to his tax consultant.

4. When, in early 1955, the time came to make out his 1954 federal tax return, he was unable to give or supply the necessary information to his tax consultant, who in turn, was obliged to make extensive investigation, and write letters to banks and brokers in an attempt to gather the information necessary to prepare the return. It was at this time that his wife actively took over all of his financial affairs.

5. Decedent was attended by Dr. Frederick Poppe of Coral Gables, who diagnosed and recorded his findings at the time as follows —

*January 6, 1955* — This patient is getting a bit senile and we will have to watch his mental capacity so we can advise his wife.

*February 9, 1955* — We can check on his chronic lymphatic leukemia from time to time.

*May 9, 1955* — I believe he is all over his upper respiratory infection and the present downhill course could be due to his increased effects from his leukemia. Patient doesn't understand these things as he can't even remember that he has been told that he has leukemia.

*August 4, 1955* — Patient has been losing weight regularly.

*November 4, 1955* — Sat with the pt. and talked to him about his troubles and told him he was having lapses of memory, for instance, he didn't know me the time before last (October 13, 1955) when he came in here, even though I have seen him off and on for several years and

a number of times recently. He said "I don't know you, do I?" and definitely had a blank expression. Of course, it is difficult talking to a person like this and make them realize what we are talking about. He talks about being abused and that his wife picks on him, etc. Of course, I have heard the other side of the story, so I took the practical nurse aside and she says the main contention seems to be that Mr. Cassidy has the idea that everyone is trying to get his money, especially his wife.

*April 24, 1956* — Saw patient today at the request of his wife, as the pt. is getting more and more difficult to handle. He greeted me as usual, didn't realize who I was, I asked him if he knew my name and he couldn't remember it. He couldn't remember how long it has been since he had seen me as a pt., and finally mentioned about 10 or 11 years, and of course, I saw him three months ago, on several occasions in January, 1956 and all last year quite a few times. I then ask him what year it was and he couldn't even guess. I ask if he knew what city this was and he said "yes" and when I asked him what city, he said, "Chicago". I then asked him if he thought Franklin Delano Roosevelt would run again and he didn't think he would run again. He didn't know who was running. I ask him who was president at this time and he had no idea. He said he never heard of Truman. I talked about his leukemia and blood trouble and he seemed completely confused, as usual, about that condition.

*Diagnosis* — Complete disorientation as to time, place and person. This is due to generalized arteriosclerosis, specifically cerebral arteriosclerosis.

6. His wife was well aware of this condition. She filed an affidavit with the District Director of Internal Revenue stating that her husband was seriously ill early in 1956 and that his mental and physical condition, due to his illness, was such that he could not have prepared a return nor furnished any intelligent or accurate information to anyone for that purpose. By letter dated May 25, 1957, even counsel for Florence Deegan Cassidy recognized and acknowledged that John P. Cassidy was seriously ill and probably incompetent at the time the 1955 tax return was due.

7. On May 1, 1955, he was placed in the La Posada Convalescent Home in Coral Gables, where during most of his waking hours, he went around clapping his hands and saying, "Jesus loves me". He died in this home on August 10, 1956 from generalized and cerebral arteriosclerosis.

8. During the last nineteen months of his life, Mr. Cassidy was afflicted with heart trouble, senility, leukemia, generalized arteriosclerosis and specifically cerebral arteriosclerosis. His mental condition deteriorated to the extent that he was unable to comprehend any business transactions and was unable to protect himself against his wife's designs and efforts to obtain all of his assets.

9. During the last nineteen months of his life, he was unable to recognize or call by name his personal physician and friends. For years he had wanted to visit his brother and sister-in-law in

St. Petersburg, Florida. On December 7, 1955, he visited their home and barely recognized them. His services with a company in Chicago, with which he had long been connected, were severed in 1953 because, "he didn't have all his marbles". The maids and gardener in his Coral Gables home had to keep watch over him so that he didn't wander away. The evidence showed that in December 1954 and March 1955 he was unable to enter his bank safe deposit box without special help and assistance from bank personnel; that he could not find his key; that in an effort to help him locate his key, a bank employee directed and assisted him in looking into each one of his pockets until the key was finally found; that on at least one occasion during this time, he did not know what he came for; that when it was time to close the box, the same procedure in finding the key would have to be repeated. Subsequent to March 1955, he never again entered his safe deposit box. It was taken over by his wife and placed in her name.

10. In the fall of 1954, John P. Cassidy was so worried about his mental and physical condition and the actions of his wife in pressuring him to turn over his assets to her, that upon his last trip to Chicago, he met an old friend at the luncheon table of the Chicago Athletic Club, and he asked this friend if he could talk with him out of the presence of others. On the sidewalk outside the club, he told this friend, a prominent member of the Chicago Bar, that he hated to tell him he was having trouble with his wife; that she was an alcoholic and one evening threatened to kill him with a whiskey bottle and a carving knife if he didn't give her his securities, and he wanted him to know that if he died without them, they had been taken away from him and he didn't know how long he would be able to hold out.

11. Florence D. Cassidy's conduct in securing his cash and securities is shown, among other things, by the following —

In June 1955, she sought advice from experts regarding stock transfers and rights respecting joint ownership of securities.

In July 1955, Florence D. Cassidy went to Chicago and gathered up from various sources $177,610 cash, and checks in the amount of $68,441.07, together with the following securities registered in the name of John P. Cassidy —

### CORPORATE STOCKS

| No. Shares | Company |
| --- | --- |
| 100 | American Car & Foundry |
| 133 | American Steel Foundries |
| 402 | American Tel. & Tel. Co. |
| 300 | American Tobacco Co. |
| 100 | Atchison, Topeka & Santa Fe Ry. |

| | |
|---|---|
| 769 | Commonwealth Edison Co. |
| 375 | Continental Illinois Bank, Chicago |
| 75 | First National Bank, Chicago |
| 200 | General Dynamics Corp. |
| 200 | Kansas City Southern Ry. |
| 100 | Montgomery, Ward & Co. |
| 200 | Murray Company of Texas |
| 400 | New York Central R.R. |
| 200 | Northern Illinois Gas Co. |
| 367 | Peoples Gas Light & Coke Co. |
| 100 | Pullman |
| 200 | Standard Oil, Indiana |
| 20 | Standard Oil, N. J. |
| 2,000 | Union Carbide & Carbon |
| 50 | United States Steel |
| 56 | Westinghouse |

### U. S. TREASURY BONDS

| Amount | Payable |
|---|---|
| $ 3,000 | 2% due 9/15/53 |
| 3,000 | 2% due 6/15/54 |
| 2,000 | 2% due 12/15/54 |
| 8,000 | 2¼% due 9/15/59 |
| 4,000 | 2¼% due 6/15/62 |
| 1,000 | 2¼% due 12/15/62 |
| 1,000 | 2½% due 12/15/69 |

### CORPORATE BONDS

| | |
|---|---|
| $ 2,000 | Illinois Central R.R. |
| 1,800 | Standard Oil Co., Indiana |
| 10,000 | C. & N. W. Ry. |

On July 27, 1955, Florence D. Cassidy, delivered all of the above securities and monies to the Harris Trust Company in Chicago and requested it to send them to the First National Bank of Miami, in her name. The monies and checks went into her own accounts and she retained possession of all the securities. Thereafter she procured the transfer of all these securities, either directly, or indirectly, to her name. This was accomplished by tracing the signature of John P. Cassidy on some of the securities; by holding and guiding his hand in signing others and by her domination and coercion.

It is significant that prior to 1955, John P. Cassidy actively traded in the stock market and handled his own affairs. From January 1955 to the day of his death, his wife handled his personal affairs.

On July 15, 1955, Florence D. Cassidy sent a letter to the Pan American Bank, enclosing five purported signatures of her husband, John P. Cassidy, in which she stated — "I doubt if the enclosed signatures will be effective. However, I shall try again this week and mail them, after I have."

On April 27, 1956, three days after his doctor had diagnosed his condition as completely disorientated as to time, place and person, Florence D. Cassidy obtained from him a general power of attorney, giving her, among other things, power to endorse checks, negotiable instruments, execute proxies and to perform any and all other acts in his behalf connected with his affairs. This power of attorney was executed approximately four days before he entered the LaPosada Convalescent Home. It was used to give her complete control over all securities owned individually or jointly.

While confined to the La Posada Convalescent Home in June and July, 1956, at a time when he was fast approaching death, and at a time when he was completely disoriented, Florence D. Cassidy, on several occasions, with the assistance of one of the nurses in guiding his hand, obtained his signature on numerous stock certificates and checks.

12. Florence D. Cassidy died on May 5, 1958. Her will completely cut out his family and left all of these assets to strangers and various charities.

13. In over fifty letters written by John P. Cassidy to his family, from 1952 down to the fall of 1955, when he could no longer write, there is shown a great love, affection and deep interest in their health and welfare. He had from time to time purchased homes for some of them; furnished the money for trips to California and Europe, and at all times gave them the benefit of his advice in their personal problems and when they needed financial help, he came to their aid.

14. That the defendant did not make proof of or sustain any of the allegations of its answer for the denial of the relief prayed for by the plaintiff, and that the equities of said cause are with the administrator ad litem.

### Conclusions of Law

1. Defendant's motion for summary judgment is denied.

2. The court finds the evidence is clear, certain and convincing in support of the conclusion that John P. Cassidy lacked the necessary mental capacity to effect a valid gift during the last nineteen months of his life and that all of the securities, money and assets transferred to Florence D. Cassidy by him during said period, were obtained by fraud and undue influence and are held by the First National Bank of Miami, executor, as constructive trustee.

The court finds that from 1951 to August 10, 1956, John P. Cassidy and Florence D. Cassidy were husband and wife; that from and after January 1, 1955, the said Florence D. Cassidy

managed the financial affairs of her husband, and a confidential and fiduciary relationship existed between them; that as a matter of law, after the plaintiff had submitted evidence of a fiduciary relationship and mental incapacity, the burden of proof shifted to the defendant to affirmatively prove that the transfer of securities and money to Florence D. Cassidy from John P. Cassidy, during the last nineteen months of his life, was free of undue influence or fraud and was the result of the exercise of the free will of John P. Cassidy. This burden, under the law, the defendant has failed to carry.

4. The motion of the plaintiff for leave to amend his complaint to conform to the evidence pursuant to Florida rule of civil procedure 1.15(b) is granted.

Wherefore, it is, ordered, adjudged and decreed —

1. That the First National Bank of Miami, executor of the estate of Florence Deegan Cassidy, deceased, shall transfer to the First National Bank of Miami, as executor of the estate of John P. Cassidy, deceased, the securities listed in paragraph 11 of the Findings of Fact, above.

2. That defendant render a full and complete accounting for all cash and stock dividends, stock splits and increments received from the above described securities, by defendant or its decedent, and that the proceeds thereof or amount determined due, be transferred to the First National Bank of Miami, as executor of the estate of John P. Cassidy.

3. That defendant render a full and complete accounting for the proceeds of any of the above described securities which were sold or otherwise disposed of by defendant or its decedent; and that the proceeds thereof or amount determined due, be transferred to the First National Bank of Miami, as executor of the estate of John P. Cassidy.

4. That plaintiff recover from defendant the sum of $246,-051.07, together with interest from July 27, 1955, which sum shall be transferred to the First National Bank of Miami, as executor of the estate of John P. Cassidy.

5. That all costs and expenses incurred herein by the administrator ad litem, be assessed against and paid out of the fund created by this decree.

6. The court retains jurisdiction of this cause and of the assets to be transferred to the executor of the estate of John P. Cassidy by the defendant, for further disposition, pursuant to further order of this court.